(Slip Opinion)     OCTOBER TERM, 2020     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AMG CAPITAL MANAGEMENT, LLC, ET AL. *v.* FEDERAL TRADE COMMISSION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 19–508.   Argued January 13, 2021—Decided April 22, 2021

The Federal Trade Commission filed a complaint against Scott Tucker and his companies alleging deceptive payday lending practices in violation of §5(a) of the Federal Trade Commission Act.  The District Court granted the Commission's request pursuant to §13(b) of the Act for a permanent injunction to prevent Tucker from committing future violations of the Act, and relied on the same authority to direct Tucker to pay $1.27 billion in restitution and disgorgement.  On appeal, the Ninth Circuit rejected Tucker's argument that §13(b) does not authorize the award of equitable monetary relief.

*Held*: Section 13(b) does not authorize the Commission to seek, or a court to award, equitable monetary relief such as restitution or disgorgement.  Pp. 3–15.

  (a) Congress granted the Commission authority to enforce the Act's prohibitions on "unfair or deceptive acts or practices," 15 U. S. C. §§45(a)(1)–(2), by commencing administrative proceedings pursuant to §5 of the Act.  Section 5(*l*) of the Act authorizes the Commission, following completion of the administrative process and the issuance of a final cease and desist order, to seek civil penalties, and permits district courts to "grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission."  §45(*l*).  Section 19 of the Act further authorizes district courts (subject to various conditions and limitations) to grant "such relief as the court finds necessary to redress injury to consumers," §57b(b), in cases where someone has engaged in unfair or deceptive conduct with respect to which the Commission has issued a final cease and desist order applicable to that person, see §57b(a)(2).  Here, the Commission responded to Tucker's payday lending practices

by seeking equitable monetary relief directly in district court under
§13(b)'s authorization to seek a "permanent injunction." In doing so,
the Commission acted in accordance with its increasing tendency to
use §13(b) to seek monetary awards without prior use of the Commis-
sion's traditional administrative proceedings. The desirability of the
Commission's practice aside, the question is whether Congress, by en-
acting §13(b) and using the words "permanent injunction," granted the
Commission authority to obtain monetary relief directly from courts
and effectively bypass the requirements of the administrative process.
Pp. 3–6.

(b) Section 13(b) does not explicitly authorize the Commission to ob-
tain court-ordered monetary relief, and such relief is foreclosed by the
structure and history of the Act. Section 13(b) provides that the "Com-
mission may seek . . . a permanent injunction." §53(b). By its terms,
this provision concerns prospective injunctive relief, not retrospective
monetary relief. Section 13(b) allows the Commission to go directly to
district court when the Commission seeks injunctive relief pending ad-
ministrative proceedings or when it seeks only a permanent injunc-
tion. Other statutory provisions, in particular the conditioned and lim-
ited monetary relief authorized in §19, confirm this conclusion. It is
highly unlikely that Congress, without mentioning the matter, would
grant the Commission authority to circumvent its traditional §5 ad-
ministrative proceedings. Pp. 6–10.

(c) The Commission's contrary arguments are unavailing. First,
*Porter* v. *Warner Holding Co.*, 328 U. S. 395, and *Mitchell* v. *Robert
DeMario Jewelry*, *Inc.*, 361 U. S. 288, did not adopt a universal rule
that statutory authority to grant an injunction automatically encom-
passes the power to grant equitable monetary remedies. Instead, the
text and structure of the particular statutory scheme at issue can limit
a court's jurisdiction in equity. Second, in enacting §19 two years after
§13(b), Congress did not simply create an alternative enforcement path
with similar remedies. The Court does not believe Congress would
have enacted §19's provisions expressly authorizing monetary relief if
§13(b) already implicitly allowed the Commission to obtain that same
monetary relief without satisfying §19's conditions and limitations.
Third, §19's saving clauses—preserving "any authority of the Commis-
sion under any other provision of law" and "any other remedy or right
of action provided by State or Federal law," §57b(e)—do not help an-
swer whether §13(b) gave the Commission the authority to obtain eq-
uitable monetary relief directly in court in the first place. Fourth, the
Act's 1994 and 2006 amendments, which did not modify the specific
language at issue here, do not demonstrate congressional acquiescence
to lower court rulings that favor the Commission's interpretation of

Syllabus

§13(b). Fifth, policy arguments that §5 and §19 are inadequate to pro-
vide redress to consumers should be addressed to Congress. Pp. 10–
14.

910 F. 3d 417, reversed and remanded.

BREYER, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 19–508

AMG CAPITAL MANAGEMENT, LLC, ET AL.,
PETITIONERS *v.* FEDERAL TRADE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 22, 2021]

JUSTICE BREYER delivered the opinion of the Court.

Section 13(b) of the Federal Trade Commission Act authorizes the Commission to obtain, "in proper cases," a "permanent injunction" in federal court against "any person, partnership, or corporation" that it believes "is violating, or is about to violate, any provision of law" that the Commission enforces. 87 Stat. 592, 15 U. S. C. §53(b). The question presented is whether this statutory language authorizes the Commission to seek, and a court to award, equitable monetary relief such as restitution or disgorgement. We conclude that it does not.

I

Petitioner Scott Tucker controlled several companies that provided borrowers with short-term payday loans. The companies, operating online, would show a potential customer a loan's essential terms. When the companies explained those terms, they misled many customers. The companies' written explanations seemed to say that customers could normally repay a loan by making a single payment. And that payment would cost a person who, for example, borrowed $300 an extra $90. (The customer would

likely repay a total of $390.)  But in fine print the explanations said that the loan would be automatically renewed unless the customer took affirmative steps to opt out.  Thus, unless the customer who borrowed $300 was aware of the fine print and actively prevented the loan's automatic renewal, he or she could end up having to pay $975, not $390. Between 2008 and 2012, Tucker's businesses made more than 5 million payday loans, amounting to more than $1.3 billion in deceptive charges.

In 2012 the Federal Trade Commission filed suit and claimed that Tucker and his companies were engaging in "unfair or deceptive acts or practices in or affecting commerce," in violation of §5(a) of the Act.  15 U. S. C. §45(a)(1). (We shall refer to all of the defendants collectively as Tucker.)  In asserting that Tucker's practices were likely to mislead consumers, the Commission did not first use its own administrative proceedings.  Rather, the Commission filed a complaint against Tucker directly in federal court. The Commission, relying upon §13(b), asked the court to issue a permanent injunction to prevent Tucker from committing future violations of the Act.  Relying on the same provision, the Commission also asked the court to order monetary relief, in particular, restitution and disgorgement.  The Commission moved for summary judgment.

The District Court granted the Commission's summary judgment motion.  The court also granted the Commission's request for an injunction and directed Tucker to pay $1.27 billion in restitution and disgorgement.  The court ordered the Commission to use these funds first to provide "direct redress to consumers" and then to provide "other equitable relief" reasonably related to Tucker's alleged business practices.  Finally, the court ordered the Commission to deposit any remaining funds in the United States Treasury as disgorgement.

On appeal, Tucker argued that §13(b) does not authorize the monetary relief the District Court had granted.  The

Ninth Circuit rejected Tucker's claim. 910 F. 3d 417 (2018). It pointed to Circuit precedent that had interpreted §13(b) as "empower[ing] district courts to grant any ancillary relief necessary to accomplish complete justice, including restitution." *FTC* v. *Commerce Planet, Inc.*, 815 F. 3d 593, 598 (2016); see also *FTC* v. *H. N. Singer, Inc.*, 668 F. 2d 1107, 1113 (CA9 1982). Two judges, while recognizing that precedent in many Circuits supported that use of §13(b), expressed doubt as to the correctness of that precedent.

Tucker then sought certiorari in this Court. In light of recent differences that have emerged among the Circuits as to the scope of §13(b), we granted his petition.

## II

The Federal Trade Commission Act prohibits, and authorizes the Commission to prevent, "[u]nfair methods of competition" and "unfair or deceptive acts or practices." 15 U. S. C. §§45(a)(1)–(2). The Act permits the Commission to use both its own administrative proceedings (set forth in §5 of the Act) and court actions in exercising this authority. In construing §13(b), it is helpful to understand how the Commission's authority (and its interpretation of that authority) has evolved over time.

Ever since the Commission's creation in 1914, it has been authorized to enforce the Act through its own administrative proceedings. Section 5 of the Act describes the relevant administrative proceedings in some detail. If the Commission has "reason to believe" that a party "has been or is using any unfair method of competition or unfair or deceptive act or practice," it can file a complaint against the claimed violator and adjudicate its claim before an Administrative Law Judge. §45(b). The ALJ then conducts a hearing and writes a report setting forth findings of fact and reaching a legal conclusion. *Ibid.* If the ALJ concludes that the conduct at issue was unfair or misleading, the ALJ will issue

an order requiring the party to cease and desist from engaging in the unlawful conduct. *Ibid.* The party may then seek review before the Commission and eventually in a court of appeals, where the "findings of the Commission as to the facts" (if supported by the evidence) "shall be conclusive." §45(c). If judicial review favors the Commission (or if the time to seek judicial review expires), the Commission's order normally becomes final (and enforceable). §45(g).

In the 1970s Congress authorized the Commission to seek additional remedies in court. In 1973 Congress added §13(b), the provision at issue here. That provision permits the Commission to proceed directly to court (prior to issuing a cease and desist order) to obtain a "temporary restraining order or a preliminary injunction," and also allows the Commission, "in proper cases," to obtain a court-ordered "permanent injunction." 15 U. S. C. §53(b). In the same legislation, Congress also amended §5(*l*) of the Act to authorize district courts to award civil penalties against respondents who violate final cease and desist orders, and to "grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission." §45(*l*). Two years later, Congress enacted §19 of the Act, which authorizes district courts to grant "such relief as the court finds necessary to redress injury to consumers," including through the "refund of money or return of property." §57b(b). However, Congress specified that the consumer redress available under §19 could be sought only (as relevant here, and subject to various conditions and limitations) against those who have "engage[d] in any unfair or deceptive act or practice . . . with respect to which the Commission has issued a final cease and desist order which is applicable to such person." §57b(a)(2).

Beginning in the late 1970s, the Commission began to use §13(b), and in particular the words "permanent injunction,"

to obtain court orders for redress of various kinds in consumer protection cases—without prior use of the administrative proceedings in §5. See, *e.g.*, *FTC* v. *Virginia Homes Mfg. Corp.*, 509 F. Supp. 51, 59 (Md. 1981) (relying on §13(b) to order the defendant to notify past customers of their warranty rights); see also D. FitzGerald, The Genesis of Consumer Protection Remedies Under Section 13(b) of the FTC Act 1–2, Paper at FTC 90th Anniversary Symposium, Sept. 23, 2004 (FitzGerald); Beales & Muris, Striking the Proper Balance: Redress Under Section 13(b) of the FTC Act, 79 Antitrust L. J. 1, 3–4 (2013). The Commission used this authority to seek and win restitution and other forms of equitable monetary relief directly in court.

Similarly, in the late 1990s the Commission began to use §13(b)'s "permanent injunction" authority in antitrust cases to seek monetary awards, such as restitution and disgorgement—again without prior use of traditional administrative proceedings. See Complaint in *FTC* v. *Mylan Labs., Inc.*, No. 98–3114 (DC); Complaint in *FTC* v. *The Hearst Trust*, No. 01–734 (DC). In 2003 the Commission issued guidance that limited its use of §13(b) to obtain monetary relief to "exceptional cases" involving a "[c]lear [v]iolation" of the antitrust laws. Policy Statement on Monetary Equitable Remedies in Competition Cases, 68 Fed. Reg. 45821 (emphasis deleted). But in 2012 the Commission withdrew its policy statement and the limitations it imposed. See Withdrawal of the Commission Policy Statement on Monetary Equitable Remedies in Competition Cases, 77 Fed. Reg. 47071.

The result is that the Commission presently uses §13(b) to win equitable monetary relief directly in court with great frequency. The Commission tells us that "the agency [now] brings dozens of [§13(b)] cases every year seeking a permanent injunction and the return of illegally obtained funds." Brief for Respondent 8; see also, *e.g.*, Ohlhausen, Dollars, Doctrine, and Damage Control: How Disgorgement Affects

the FTC's Antitrust Mission 7, Speech at Dechert LLP, NY, Apr. 20, 2016 (Commission sought disgorgement in antitrust cases four times between 2012 and 2016, which is "as many times as the [Commission] pursued such relief in the prior twenty years"). With respect to consumer protection cases, the Commission adds that "there's no question that the agency brings far more cases in court than it does in the administrative process." Tr. of Oral Arg. 49. In fiscal year 2019, for example, the Commission filed 49 complaints in federal court and obtained 81 permanent injunctions and orders, resulting in $723.2 million in consumer redress or disgorgement. See FTC, Fiscal Year 2021 Congressional Budget Justification 5 (Feb. 10, 2020), https://www.ftc.gov/system/files/documents/reports/fy-2021-congressional‑budget‑justification/fy_2021_cbj_final.pdf. In the same period, the Commission issued only 21 new administrative complaints and 21 final administrative orders.

Our task here is not to decide whether this substitution of §13(b) for the administrative procedure contained in §5 and the consumer redress available under §19 is desirable. Rather, it is to answer a more purely legal question: Did Congress, by enacting §13(b)'s words, "permanent injunction," grant the Commission authority to obtain monetary relief directly from courts, thereby effectively bypassing the process set forth in §5 and §19?

## III

Several considerations, taken together, convince us that §13(b)'s "permanent injunction" language does not authorize the Commission directly to obtain court-ordered monetary relief. For one thing, the language refers only to injunctions. It says, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent *injunction*." 15 U. S. C. §53(b) (emphasis added). An "injunction" is not the same as an award of equitable monetary relief. Compare, *e.g.*, *United States* v. *Oregon State*

*Medical Soc.*, 343 U. S. 326, 333 (1952) (injunction typically offers prospective relief against ongoing or future harm), with, *e.g.*, 1 D. Dobbs, Law of Remedies §4.1(1) (2d ed. 1993) (restitution typically offers retrospective relief to redress past harm). We have, however, sometimes interpreted similar language as authorizing judges to order equitable monetary relief. See *Porter* v. *Warner Holding Co.*, 328 U. S. 395 (1946); *Mitchell* v. *Robert DeMario Jewelry, Inc.*, 361 U. S. 288 (1960).

But if this language alone is not enough, there is more. The language and structure of §13(b), taken as a whole, indicate that the words "permanent injunction" have a limited purpose—a purpose that does not extend to the grant of monetary relief. Those words are buried in a lengthy provision that focuses upon purely injunctive, not monetary, relief. It says (in relevant part):

"Whenever the Commission has reason to believe—

"(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

"(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

"the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however*, That if a complaint is not

filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further*, That *in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.*" 15 U. S. C. §53(b) (final emphasis added).

Taken as a whole, the provision focuses upon relief that is prospective, not retrospective. Consider the words "is violating" and "is about to violate" (not "has violated") setting forth when the Commission may request injunctive relief. Consider too the words "pending the issuance of a complaint," "until such complaint is dismissed," "temporary restraining order," "preliminary injunction," and so forth in the first half of the section. These words reflect that the provision addresses a specific problem, namely, that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness. Cf. §53(a) (providing similar provisional relief where false advertising regarding food, drugs, devices, and cosmetics is at issue). And the appearance of the words "permanent injunction" (as a proviso) suggests that those words are directly related to a previously issued preliminary injunction. They might also be read, for example, as granting authority for the Commission to go one step beyond the provisional and ("in proper cases") dispense with administrative proceedings to seek what the words literally say (namely, an *injunction*). But to read those words as allowing what they do not say, namely, as allowing the Commission to dispense with administrative proceedings to obtain monetary relief as well, is to read the words as going well beyond the provision's subject matter. In light of the historical importance of administrative proceedings, that reading would allow a small statutory tail to wag a very large

dog.

Further, the structure of the Act beyond §13(b) confirms this conclusion. Congress in §5(*l*) and §19 gave district courts the authority to impose limited monetary penalties and to award monetary relief in cases where the Commission has *issued cease and desist orders*, *i.e.*, where the Commission has engaged in administrative proceedings. Since in these provisions Congress explicitly provided for "other and further equitable relief," 15 U. S. C. §45(*l*), and for the "refund of money or return of property," §57b(b), it likely did not intend for §13(b)'s more cabined "permanent injunction" language to have similarly broad scope.

More than that, the latter provision (§19) comes with certain important limitations that are absent in §13(b). As relevant here, §19 applies only where the Commission begins its §5 process within three years of the underlying violation and seeks monetary relief within one year of any resulting final cease and desist order. 15 U. S. C. §57b(d). And it applies only where "a reasonable man would have known under the circumstances" that the conduct at issue was "dishonest or fraudulent." §57b(a)(2); see also §45(m)(1)(B)(2) (providing court-ordered monetary penalties against anyone who engages in conduct previously identified as prohibited in a final cease and desist order, but only if the violator acted with "actual knowledge that such act or practice is unfair or deceptive"). In addition, Congress enacted these other, more limited, monetary relief provisions at the same time as, or a few years after, it enacted §13(b) in 1973.

It is highly unlikely that Congress would have enacted provisions expressly authorizing *conditioned* and *limited* monetary relief if the Act, via §13(b), had already implicitly allowed the Commission to obtain that same monetary relief and more without satisfying those conditions and limitations. Nor is it likely that Congress, without mentioning the matter, would have granted the Commission authority

so readily to circumvent its traditional §5 administrative proceedings. See FitzGerald 1 (arguing that, in the mid-1970s, "no one imagined that Section 13(b) of the [FTC] Act would become an important part of the Commission's consumer protection program" (footnote omitted)).

At the same time, to read §13(b) to mean what it says, as authorizing injunctive but not monetary relief, produces a coherent enforcement scheme: The Commission may obtain monetary relief by first invoking its administrative procedures and then §19's redress provisions (which include limitations). And the Commission may use §13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, or when it seeks only injunctive relief. By contrast, the Commission's broad reading would allow it to use §13(b) as a substitute for §5 and §19. For the reasons we have just stated, that could not have been Congress' intent. Cf. *Whitman* v. *American Trucking Assns.*, *Inc.*, 531 U. S. 457, 468 (2001) ("Congress . . . does not . . . hide elephants in mouseholes").

## IV

The Commission makes several arguments to the contrary. First, the Commission points to traditional equitable practice and to two previous cases where we interpreted provisions authorizing injunctive relief to authorize equitable monetary relief as well. See *Porter* v. *Warner Holding Co.*, 328 U. S. 395 (1946); *Mitchell* v. *Robert DeMario Jewelry, Inc.*, 361 U. S. 288 (1960). In *Porter* we said that "[n]othing is more clearly a part of the subject matter of a suit for an injunction than the recovery of that which has been illegally acquired and which has given rise to the necessity for injunctive relief." 328 U. S., at 399. In *Mitchell* we said that, "[w]hen Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of

the statutory purposes." 361 U. S., at 291–292. The Commission argues that these cases consequently support the proposition that the traditional equitable "authority to grant an 'injunction' includes the power to grant restorative monetary remedies." Brief for Respondent 21.

The problem for the Commission is that we did not in these two cases purport to set forth a universal rule of interpretation. And both cases involved different statutes. See *Porter*, 328 U. S., at 397 (Emergency Price Control Act provision authorizing courts to issue "'a permanent or temporary injunction, restraining order, or other order'"); *Mitchell*, 361 U. S., at 289 (Fair Labor Standards Act provision authorizing courts to "'restrain violations'" of the Act's antiretaliation ban). In both cases, we recognized that the text and structure of the statutory scheme at issue can, "in so many words, or by a necessary and inescapable inference, restric[t] the court's jurisdiction in equity." *Porter*, 328 U. S., at 398; *Mitchell*, 361 U. S., at 291. Thus in *Porter* we examined "other provision[s] of the [Emergency Price Control] Act" to determine whether they "expressly or impliedly preclud[e] a court from ordering restitution in the exercise of its equity jurisdiction." 328 U. S., at 403. And in *Mitchell* we examined other provisions of the Fair Labor Standards Act before concluding that there was "no indication in the language" that the statute precluded equitable relief in the form of lost wages. 361 U. S., at 294.

Moreover, more recently, we have held, based on our reading of a statutory scheme as a whole, that a provision's grant of an "injunction" or other equitable powers does not automatically authorize a court to provide monetary relief. Rather, we have said, the scope of equitable relief that a provision authorizes "remains a question of interpretation in each case." *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 257 (1993). Our decision in *Meghrig* v. *KFC Western, Inc.*, 516 U. S. 479 (1996), is instructive. There, we considered a provision in the Resource Conservation and Recovery Act

that authorizes district courts "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste," and "to order such person to take such other action as may be necessary, or both." 98 Stat. 3268, 42 U. S. C. §6972(a). The question was whether this language permits courts to award restitution in the form of past cleanup costs. We concluded that, despite *Porter*, the provision's grant of equitable authority does not authorize past cleanup costs because the relevant statutory scheme (as here) contained other "'elaborate enforcement provisions,'" including (as here) provisions that explicitly provide for that form of relief. *Meghrig*, 516 U. S., at 487. Here, the inference against §13(b)'s authorization of monetary relief is strong and follows from the interpretive approach we took in *Meghrig*.

Second, the Commission argues that Congress simply created two enforcement avenues, one administrative and the other judicial, leaving the Commission the power to decide which of the two "separate, parallel enforcement paths" to take. Brief for Respondent 41. To the extent that §19 authorizes "similar relief" as §13(b), the Commission continues, that reflects only the fact that each pathway is an alternative route to "similar endpoints." *Id.*, at 41–42. This statement, however, does not overcome the interpretive difficulties we have set forth, for example permitting the Commission to avoid the conditions and limitations laid out in §19. We cannot believe that Congress merely intended to enact a more onerous alternative to §13(b) when it enacted §19 two years later.

Third, the Commission points to saving clauses in §19, which, it says, save its ability to use §13(b) to obtain monetary relief. See *id.*, at 42. Those clauses preserve "any authority of the Commission under any other provision of law" and preserve "any other remedy or right of action provided

by State or Federal law." 15 U. S. C. §57b(e). Here, however, the question is not one of preserving pre-existing remedies given by other statutory provisions. The question is whether those other provisions (namely, §13(b)) gave that remedy in the first place.

Fourth, the Commission points out that the courts of appeals have, until recently, consistently accepted its interpretation, and that Congress has in effect twice ratified that interpretation in subsequent amendments to the Act. See, *e.g.*, Brief for Respondent 8, and n. 3 (citing the similar conclusions of eight Circuits). But see *FTC* v. *Credit Bureau Center, LLC*, 937 F. 3d 764 (CA7 2019); *FTC* v. *AbbVie Inc.*, 976 F. 3d 327 (CA3 2020). We have held that Congress' acquiescence to a settled judicial interpretation can suggest adoption of that interpretation. See, *e.g.*, *Monessen Southwestern R. Co.* v. *Morgan*, 486 U. S. 330, 338 (1988). We have also said, however, that when "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments . . . [i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [a court's] statutory interpretation." *Alexander* v. *Sandoval*, 532 U. S. 275, 292 (2001) (internal quotation marks omitted). We find this latter statement the more relevant here.

The two examples of acquiescence to which the Commission refers do not convince us that Congress acquiesced in the lower courts' interpretation. The Commission first points to amendments that Congress made to the Act in 1994. See §10, 108 Stat. 1695–1696. Those two amendments, however, simply revised §13(b)'s venue, joinder, and service rules, not its remedial provisions. They tell us nothing about the words "permanent injunction" in §13(b).

The Commission also points to amendments made to the Act in 2006. Those amendments modified the scope of §5 so that, where certain conduct in foreign commerce is in-

volved, §5 authorizes "'[a]ll remedies available to the Commission,'" including "'restitution.'" See §3, 120 Stat. 3372. We agree, however, that restitution is available, for example, when the Commission uses its administrative process. See, *e.g.*, 15 U. S. C. §57b(b). That being so, these amendments also tell us nothing about the scope of §13(b).

Fifth, the Commission and its *amici* emphasize the policy-related importance of allowing the Commission to use §13(b) to obtain monetary relief. They suggest that it is undesirable simply to enjoin those who violate the Act while leaving them with profits earned at the unjustified expense of consumers. See, *e.g.*, Brief for Respondent 8–9; Brief for Truth in Advertising, Inc., as *Amicus Curiae* 7–13; Brief for American Antitrust Institute as *Amicus Curiae* 9–21; Brief for National Consumer Law Center et al. as *Amici Curiae* 10–20; Brief for Illinois et al. as *Amici Curiae* 5–11. They point to the billions of dollars that the Commission has returned to consumers as a result of the Commission's §13(b) efforts. See, *e.g.*, Brief for Respondent 8–9; Brief for Illinois et al. as *Amici Curiae* 5.

Nothing we say today, however, prohibits the Commission from using its authority under §5 and §19 to obtain restitution on behalf of consumers. If the Commission believes that authority too cumbersome or otherwise inadequate, it is, of course, free to ask Congress to grant it further remedial authority. Indeed, the Commission has recently asked Congress for that very authority, see Hearing before the Senate Committee on Commerce, Science, and Transportation on Oversight of the Federal Trade Commission, Prepared Statement of the FTC, 116th Cong., 2d Sess., 3–5 (2020), and Congress has considered at least one bill that would do so, see S. 4626, 116th Cong., 2d Sess., §403 (2020) (revising §13 to expressly authorize restitution and disgorgement). We must conclude, however, that §13(b) as currently written does not grant the Commission authority to obtain equitable monetary relief.

Opinion of the Court

\*  \*  \*

For these reasons, we reverse the Ninth Circuit's judgment, and we remand the case for further proceedings consistent with this opinion.

*It is so ordered.*